# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

---

MARK A. WINEGARD,

                                         Plaintiff,

-v-                                                              DECISION AND ORDER

JO ANNE B. BARNHART, Commissioner of Social              02-CV-6231 CJS
Security,

                                         Defendant.

---

## APPEARANCES

For plaintiff:                    Mark A. Winegard, *pro se*
                                  160 Moulson Street Apt. #2
                                  Rochester, NY 14621

For defendant:                    Brian M. McCarthy, A.U.S.A.
                                  U.S. Attorney's Office
                                  100 State Street
                                  Room 620
                                  Rochester, NY 14614
                                  (585) 263-6760

## INTRODUCTION

**Siragusa, J.** This Social Security case is before the Court on the

Commissioner's motion (# 10) for judgment on the pleadings. For the reasons stated

below, the Commissioner's decision denying benefits is affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for Supplemental Security Income ("SSI") benefits on

July 1, 1998. (R. 64-66.) The application was denied initially (R. 35, 37-40) and upon

reconsideration (R. 36, 49-52). Plaintiff requested a hearing before an Administrative

Law Judge ("ALJ") and on November 7, 2001, a hearing was held before ALJ James E.

Dombeck, at which time plaintiff appeared *pro se* and testified. (R. 21-34.) On December 17, 2001, the ALJ issued his decision finding that plaintiff's impairments met the requirements of Listings 12.04 and 12.09 of the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 9-20.) However, the ALJ also determined that plaintiff's drug abuse and alcoholism were contributing factors material to the determination of disability. (R. 15.) The ALJ concluded that, independent of his drug abuse and alcoholism, plaintiff was able to perform his past relevant work as an auto body painter. (R. 18.) Accordingly, the ALJ determined that plaintiff was not disabled for purposes of the Act. The ALJ's decision became the final decision of the Commissioner when, on March 22, 2002, the Appeals Council denied plaintiff's request for review. (R. 5-6.) Plaintiff filed a complaint in this Court on April 25, 2002, and the Commissioner filed her motion for judgment on the pleadings on January 14, 2003. The Court set Feburary 28, 2003, as the date for all responsive papers. To date, plaintiff has not filed any response to the Commissioner's motion.

## NONMEDICAL EVIDENCE

Plaintiff was born on June 9, 1957 (R. 64) and completed high school (R. 78). He has past relevant experience in an auto body repair shop, performing collision and painting work. (R. 30, 78.) Plaintiff testified before the ALJ that while he was incarcerated from 1995 to 1998, he worked "doing different things. At first, we just drove around in this dam [sic] van all day. They had us, well, I stringed a fence. Made us do some roofing." (R. 30.) In response to a question from the ALJ, he further testified that he was able to do that work "[t]o a degree…." (*Id.*) He also testified that while in prison,

he did not use drugs "to any degree," and was able to "function all right there in the prisons." (R. 31.) Plaintiff further testified that he applied for disability because

> Well, I had a, I've got a terrible track record for one thing. I can't hold a job. I've been in jail a million times. I had a back injury a while back, and the problems with my neck drives me half nuts.… The main thing, I guess, as far as my physical well-being is that somehow I've contracted Hepatitis C, and it leaves me real fatigued.

(R. 25.) Plaintiff indicated that he had been prescribed pain pills and muscle relaxers, "but none of that stuff really worked." (R. 27.) He also explained that physical therapy, which he attended about two years earlier, helped.

When the ALJ asked plaintiff about whether he had been receiving any treatment for his diagnosis of hepatitis C, plaintiff responded,

> Well, I can't get any treatment until I, my doctor me [sic] I don't have, I mean, a bit of alcohol. And that seems to be—it is a problem for me. I haven't managed to just totally quit drinking. See, well, no doctor will give me treatment, you know, I'm still drinking and whatever [sic]. I don't know, but he doesn't want to, he says he's not going to do nothing [sic] until I quit drinking.

(R. 28.) As for his asthma, plaintiff testified that he,

> did bodywork on and off, and you know, painting, collission [sic] painting and stuff. And then, I breathed a bunch of stuff that I shouldn't have breathed. So, they got me on an inhaler and they got, the had me do this thing that you inhale some kind of fumes, I forget what it's called though. I don't know if it's really asthma. I think it was something from the painting.

(R. 29.) Plaintiff further testified that he has never sought emergency room treatment or been hospitalized for breathing problems. (R. 29.) Likewise, his stated that his back pain has never required any hospital treatment. (*Id*.) When asked about his current drug use, plaintiff stated that he still takes drugs, "[n]ot a lot.… I don't do enough to—I don't think it's a problem, I guess." (R. 30.)

**MEDICAL EVIDENCE**

Medical Evidence Prior to Plaintiff's Alleged Onset Date

The record contains health and physical therapy records dated January 2, 1991 through January 2, 1992 from the Orleans Correctional Facility, where plaintiff was incarcerated. (R. 123-63.) According to this information, plaintiff was periodically treated for congestion, scratchy throat and neck pain.

An August 8, 1991 physical therapist consult with Kathleen Lindaman, P.T., showed a normal neurological examination. (R. 143.) Ms. Lindaman noted that plaintiff had a poor sitting posture and a fair standing posture. She recommended that he engage in range of motion exercises.

On August 22, 1991, plaintiff began a course of physical therapy as a result of his complaints of chronic cervical neck pain and stiffness. (R. 141-42.) The therapy included moist heat, ultrasound, manual therapy and progressive postural flexibility and strengthening exercises. (R. 142.) Evidently as a result of the therapy, in September 1991, Ms. Lindaman noted on a request for consultation (for rash and bites) that plaintiff showed some improvement in his strength and posture. (R. 132.)

On January 27, 1998, plaintiff began treatment with Harsha Mulchandani, M.D., at Rochester General Hospital, as a result of his complaints of neck stiffness, intermit-tent tinnitus and retrorbital pain. (R. 185-86.) Upon examination, Dr. Mulchandani noted that plaintiff had normal range of neck motion and that his lungs had poor air entries bilaterally. Dr. Mulchandani diagnosed tension headaches for which he prescribed Elavil and Tylenol as needed. He also diagnosed hepatitis C and referred plaintiff to the gastrointestinal clinic. Dr. Mulchandani warned plaintiff to strictly abstain from alcohol,

and also encouraged him to quit smoking. (*Id.*) Plaintiff had a follow-up appointment on March 12, 1998. (R. 186.) At that appointment, plaintiff related to Dr. Mulchandani that he consumed up to a six-pack of beer about one to two times per week. He described a "cracking sensation" in his neck, stating that it was not pain, but stiffness. Plaintiff also related that he suffered from retrorbital pain about two to three times per week, but denied suffering from hallucinations or delusions, or feeling depressed. (R. 186.) Upon examination, Dr. Mulchandani noted that plaintiff had no palpable tenderness of the neck or paraspinal cervical muscles, had normal range of neck motion, full strength in all extremities and that his reflexes were equal and positive bilaterally. (R. 187.) Dr. Mulchandani concluded that plaintiff had chronic hepatitis secondary to hepatitis C. (R. 187.) He explained to plaintiff the importance of quitting any form of alcohol. As for plaintiff's neck stiffness, Dr. Mulchandani concluded that there was no objective evidence of cervical spine disease, or myelopathy or cord compression. Dr. Mulchandani concluded that, based upon his history, plaintiff likely had an obsession about a physical symptom. (R. 188.)

In an April 2, 1998 follow-up appointment with Dr. Mulchandani, plaintiff reported suffering from sleeping difficulties. (R. 188.) He also reported that he had stopped taking Elavil, and that he was drinking four to five beers per week. Dr. Mulchandani prescribed Prozac and plaintiff agreed that his "depression" or "psych" might be responsible for his physical symptoms. (*Id.*)

Medical Evidence Subsequent to Plaintiff' s Alleged Onset Date

Plaintiff attended physical therapy from April 2, 1998 to May 28, 1998 at Physical Medicine and Rehabilitation at Rochester General Hospital based on a referral from Dr.

Mulchandani. (R. 178-84.) At his initial evaluation, physical therapist Jacquelyn Dear noted that plaintiff related a six to seven year history of low back and neck pain of unknown etiology, initially felt in his neck and radiating to his left leg. (R. 183.) Plaintiff reported that he was currently in between jobs, but generally worked in auto repair shops, performing collision and painting work. Ms. Dear noted that prior x-rays had revealed spondylosis, Grade I spondylolisthesis at L5/S1, and degenerative disc disease at L5/S1. She also noted that a CAT scan of plaintiff's neck was negative. Upon examination, Ms. Dear remarked that plaintiff's cervical range of motion was normal tor forward bending and bilateral rotation with minimal limitation to the right; that his upper extremity range of motion and strength were normal; and that his sensation to light touch was intact. Ms. Dear concluded that plaintiff could benefit from therapy and that the prognosis for plaintiff's neck pain was good. (R. 184.) She remarked that treatment would consist of moist heat, joint mobilization, manual distraction, postural exercise, education and a home program. (R. 184.)

On May 28, 1998, Ms. Dear discharged plaintiff from physical therapy with instructions for a home program and further treatment from his primary physician, Dr. Mulchandani. (R. 178.) Ms. Dear reported in her discharge letter to Dr. Mulchandani that plaintiff continued to complain of right-sided neck pain, but that plaintiff had made improvement in range of motion. Ms. Dear also concluded that plaintiff appeared to have some degenerative changes in the cervical region. (*Id*.)

On June 2, 1998, plaintiff returned to Dr. Mulchandani complaining of a cold with nasal congestion. (R. 176.) He denied having a fever, chills, shortness of breath, wheezing, or ear pain. (R. 176.) Plaintiff also reported temporary relief of his neck pain

from physical therapy. Upon examination, plaintiff's lungs were clear to auscultation. He had poor air entries, but no wheezing. Plaintiff's extremities were normal. Dr. Mulchandani assessed chronic hepatitis C with probable cirrhosis. (R. 175.) He advised plaintiff to completely quit drinking alcohol. As for plaintiff s chronic neck stiffness, Dr. Mulchandani concluded that it was probably psychosomatic in origin as there were no clinical signs of physical disease. (R. 175.)

On July 14, 1998, plaintiff returned to Dr. Mulchandani for a comprehensive physical examination. (R. 172-73.) He presented with no complaints. (R. 172.) He was still smoking "quite a lot" and drinking beer almost every day, which he characterized as "not a lot"; however, Dr. Mulchandani noted that he drank about one-half to one pitcher daily. (R. 172.) Upon examination, plaintiff had poor air entries bilaterally, with no wheezing or rhonchi. Plaintiff had full strength throughout his extremities and his reflexes were positive bilaterally. Dr. Mulchandani assessed clinical hepatitis C with partial hypertension. (R. 173.) He instructed plaintiff to follow-up with the gastrointesti-nal clinic during the week, and, again, to absolutely abstain from alcohol. Dr. Mulchan-dani indicated that pulmonary function testing suggested reactive airways disease, although plaintiff continued to smoke. (R. 173.) He noted that plaintiff did not have shortness of breath on exertion. Dr. Mulchandani started plaintiff on Albuterol as need-ed and instructed him to return in three to four months.

On September 22, 1998, plaintiff was examined consultatively by George Sirotenko, M.D. (R. 204-08.) Plaintiff related a four year history of low back pain, a history of asthma since 1998 and hepatitis C. (R. 204.) He explained that he injured his back when he fell while working in jail. Plaintiff claimed that the hepatitis C caused

fatigue, such that after one to two hours of moderate physical activity, he needed to rest for about thirty to forty-five minutes. Plaintiff stated he was also unsure what triggered his asthma, but he denied any hospitalizations or emergency room treatment. He explained to Dr. Sirotenko that repetitive forward flexing and lifting objects weighing greater than fifty pounds exacerbated his back pain. (R. 204.) Additionally, plaintiff stated he was taking Prozac, which fairly controlled his depression. (R. 205.) He also reported that he smoked a pack of cigarettes a day, but denied any alcohol use since he quit in 1998. Finally, plaintiff related a history of IV drug use approximately ten years ago. Upon examination, Dr. Sirotenko noted in his report the following: that plaintiff's gait and station were normal and he could walk on his heels and toes; that his neck was supple with no jugular venous distention, thyromegaly, adenopathy or bruits; that his chest was clear to auscultation; that his percussion was normal; that there was no cyanosis, clubbing or edema in his extremities; that he showed no evidence of muscle atrophy; that he was able to make a fist; that his fine motor coordination was intact bilaterally; that his grip strength was 5/5; that he had full range of motion in all joints and straight leg raising was negative bilaterally; and that he had no sensory deficits. (R. 205-06.) Dr. Sirotenko also reported that an x-ray of his lumbosacral spine revealed degenerative disc disease at L5-S1 with significant osteophyte formation. (R. 206; *see also* R. 208 (Ralph N. Ricco, M.D.'s radiological report of Sep. 22, 1998).) Dr. Sirotenko's impression was a history of low back pain which caused no limitations, a history of hepatitis C with no sequelae of liver disease noted, a history of asthma, with a pulmonary function test revealing borderline obstructive disease and a subjective history of depression controlled with Prozac. (R. 206-07.) Dr. Sirotenko advised plaintiff

to avoid respiratory triggers which may exacerbate his asthma, avoid repetitive forward flexion and avoid repetitive lifting of objects weighing greater than fifty pounds. (R. 207.) He also wrote that "a formal psychiatric or psychological evaluation may be warranted" in light of plaintiff's history of depression. (R. 207.)

On the same day as his consultative examination by Dr. Sirotenko, September 22, 1998, plaintiff also underwent a psychological consultative examination by Joel Schorr, Ed.D. (R. 213-16.) At his visit, plaintiff denied any psychiatric treatment history on an in-patient basis, although he stated he had received some minimal counseling which he was required to attend while incarcerated. (R. 213.) Plaintiff reported that he began drinking alcohol at the age of ten and "using cocaine, pot and IV drugs at a relatively somewhat later age." (R. 214.) He told Dr. Schnorr that his last recreational drug usage was about two months prior and he last drank about one month ago. (*Id*.) Plaintiff also reported a lengthy arrest history, including three arrests for DWI, one for burglary, and many arrests for petit larceny. His most lengthy and most recent incarceration was from 1995 to 1997. Upon examination, plaintiff was mildly guarded with respect to his responses. (R. 214.) He denied crying spells, but admitted a great deal of difficulty with a lack of motivation or energy. He reported difficulty sleeping and fatigue during the day. (R. 215.) Dr. Schorr wrote that plaintiff's "short-term memory is reported to be extremely poor, and, indeed, he has difficulty remembering more than one out of three objects after a five minute delay." (R. 215.) Dr. Schorr also reported that plaintiff did not take his drug and alcohol abuse seriously and that he tended to minimize and deny. (*Id*.) He noted that plaintiff's attention and concentration were fair during the interview. (*Id*.) Dr. Schorr concluded that plaintiff was in need of a long-term

dual diagnosis treatment in order to obtain a reasonable and lasting recovery with regard to his substance dependence and resultant emotional issues. (R. 215.) He stated that plaintiff's ability to work was severely limited by his physical condition as well as by his tendency to be somewhat depressed and unmotivated. He also noted that plaintiff's chemical dependency would clearly interfere in a work situation. Dr. Schorr diagnosed the following:

> Axis I   Alcohol dependence, episodic, current remission questionable. Dependence on a combination of opioid and other nonalcoholic substances, in remission for two months by examinee[']s report. Dysthymic disorder, chronic.

> Axis II  Question of personality disorder, unspecified with antisocial and dependent features.

(R. 216.) Dr. Schorr wrote that he "highly recommended that the claimant be referred for evaluation treatment in dual diagnosis in patient treatment program with follow-up in a half way house or supervised living…." (R. 216.) He concluded that plaintiff was not capable of working without this type of intervention. (*Id.*)

On January 12, 1999, Dr. Mulchandani completed a New York State Department of Social Services form entitled "Medical Examination for Employability Assessment, Disability Screening and Alcoholism/Drug Addiction Determination." (R. 231-32.) In that report, Dr. Mulchandani listed the following physical functional limitations: lifting, carrying, stairs and other climbing (moderately limited); and pushing, pulling and bending (very limited). (R. 231.) He indicated that plaintiff had no physical functional limitations in walking, standing, sitting, seeing, hearing, speaking, or using his hands. (*Id.*) With regard to his mental abilities, Dr. Mulchandani indicated that plaintiff had no limitations in understanding, remembering and carrying out instructions, maintaining

attention and concentration, making decisions, interacting with others and maintaining socially appropriate behavior in a work setting. (R. 231.) Section VIII, "Screening for Possible SSI Referral," asked, "[b]ased on the evidence available to you, does this individual have severe impairment(s) which has lasted, or is expected to last a[t] least 12 months?" In his "YES" response, Dr. Mulchandani stated in explanation, "patient [with] chronic active hepatitis C which is expected to progress." In response to the question, "[i]f substance abuse is also found, would such impairment be expected to continue if use of drugs and/or alcohol were to cease?", Dr. Mulchandani also checked "YES." Dr. Mulchandani further indicated on the form that as a result of plaintiff's physical, mental and addiction limitations, he should refrain from strenuous physical activity, smokey/dusty conditions and working at heights. (R. 232.) Dr. Mulchandani wrote that he recommended that plaintiff participate in an alcohol detoxification program.

On June 9, 2000, Kevin Casey, M.D., a physician, completed a New York State Office of Temporary and Disability Assistance Division of Disability Determination form based on his May 5, 2000 examination of plaintiff. (R. 239-49.) Dr. Casey indicated that he has been treating plaintiff for hepatitis C and alcohol abuse since April 20, 1998. (R. 239.) Dr. Casey noted on the form that since his initial evaluation of him, plaintiff chronically complained of fatigue. (R. 240.) Dr. Casey indicated that plaintiff had no notable mental abnormalities. (R. 247.) He also marked on the form that plaintiff was not limited in lifting/carrying, standing/walking, sitting, or pushing and pulling. (R. 248.) Further, he marked that plaintiff had no postural, manipulative, visual, communicative or environmental limitations. (R. 249.)

On August 5, 2000, plaintiff was examined consultatively by Richard Wolfe, Ph.D., a psychologist. (R. 253-59.) Plaintiff related to Dr. Wolfe complaints of difficulty sleeping, decreased appetite, loss of ten pounds of weight, and decreased sexual drive and interest. (R. 254.) Dr. Wolfe also noted that plaintiff claimed that he was often depressed, had lost interest in most activities of daily living, was irritable and "extremely fatigued" and had difficulties with memory and concentration. (*Id*.) Plaintiff further reported to Dr. Wolfe that he experienced "panic attacks three or four times a week characterized by nausea, sweating, difficulty breathing, dizziness and chest pain." (R. 254.) While plaintiff stated to Dr. Wolfe that he did not currently use drugs or alcohol, he admitted that, until a few months ago, he drank beer on a regular basis, and also admitted that he had used cocaine on a regular basis since age twenty-eight. (R. 255.) Upon examination, Dr. Wolfe noted: that plaintiff's thought processes were coherent with no evidence of confusion or loosening of association; that his affect was irritable and otherwise dysphoric; and that his mood was mildly apprehensive. (R. 256.) Dr. Wolfe reported that plaintiff's responses to tests of calculation and memory suggested that his attention and concentration were only mildly impaired by his depression and anxiety. Additionally, Dr. Wolf indicated that tests of plaintiff's remote and recent memory suggested that these skills were also mildly impaired. Dr. Wolfe concluded that plaintiff's cognitive functioning was in the low average range or below and, based upon his history of drug and alcohol use, concluded that plaintiff's judgment was poor. (R. 257.) Dr. Wolfe diagnosed the following:

      Axis I  Depressive disorder, NOS
                Anxiety disorder, NOS

> Alcohol abuse, in partial remission
> Cocaine abuse, in partial remission

Axis II Personality disorder, with mixed features.

(R. 258.)

As a result of his diagnoses, Dr. Wolf recommended that plaintiff "resume his involvement in [a] drug and alcohol treatment program … [and] be evaluated by a psychiatrist who could assess his need for psychotropic medication." (R. 258.) Dr. Wolfe expressed his belief based on his examination that plaintiff "would have [a] mild to moderate degree of difficulty performing complex tasks independently and dealing appropriately with the normal stressors of a competitive work environment." (R. 257.) Moreover, he wrote that plaintiff "would also have some problems with sustained concentration and effort working at a competitive pace and remembering instructions, largely as a result of his depression and anxiety." (R. 258.) Dr. Wolfe concluded that plaintiff would be an appropriate candidate for vocational rehabilitation if he remained clean and sober. However, he cautioned that, although plaintiff was intellectually capable of managing his own funds, he might may not use good judgment in light of his history of drug and alcohol abuse. (R. 258.)

On August 5, 2000, plaintiff was given an internal medical examination by Dr. Sirotenko.[1] (R. 260-64.) Plaintiff related that he had been abstinent from alcohol since 1999, when he completed rehabilitation. (R. 261.) He also stated that he smoked and snorted cocaine until about six months prior. Upon examination, Dr. Sirotenko reported:

---

[1]Plaintiff had been seen by Dr. Sirotenko in a consultative examination conducted on September 22, 1998, and discussed above.

that plaintiff was in no acute distress; that his gait was normal and he could walk on his heels and toes; that he had full range of motion in the shoulders, elbows, forearms, wrists and fingers; that his strength was 5/5 in the upper extremities; that his cervical and thoracic spinal examination was normal; that he experienced paralumbar tenderness from L2 to L5; that his straight leg raising was negative bilaterally; that his strength was 5/5 in the lower extremities; that his deep tendon reflexes were physiologic and equal; that he had no sensory deficits; that he had no evident muscle atrophy evident; that his hand and finger dexterity were intact; and that his grip strength was 5/5. (R. 261-63.) In the portion of his report entitled "Impression," Dr. Sirotenko wrote that: plaintiff had a history of hepatitis C, currently with no features of heptomegaly; a history of degenerative joint disease of the cervical spine, currently with mild limitations in range of motion of the cervical spine and paraspinal tenderness from C5 to C7; no features of upper extremity radiculopathy; a history of low back pain with no features of lower extremity radiculopathy; and a history of anxiety and depression. (R. 263.) While Dr. Sirotenko concluded that plaintiff should avoid cervical spine extension or rotation, repetitive forward flexion or extension and repetitive kneeling, squatting, bending and stair climbing, he fount that plaintiff was able to push, pull and lift objects weighing up to twenty pounds on an intermittent basis and had no limitations in upper extremity use or fine motor activity. (R. 263-64.)

On September 12, 2001, Dr. Casey completed a "Medical Source Statement of Ability to Perform Work-related Activities (Physical)." (R. 293-96.) Dr. Casey concluded that plaintiff had no limitations in lifting/carrying, standing/walking, sitting and push-

ing/pulling. (R. 293-94.) Dr. Casey also found that plaintiff could frequently climb, balance, kneel, crouch, crawl and stoop. (R. 294.)

On September 14, 2001, M.[2] Dlugozima, M.D., completed a "Medical Source Statement of Ability to Perform Work-related Activities (Physical)." (R. 301-04.) Dr. Dlugozima indicated on the form that plaintiff could lift/carry less than ten pounds, but had no limitations in standing/walking and sitting and could occasionally climb, balance, kneel, crouch, crawl and stoop. (R. 294.) In the portion of the form calling for medical and clinical findings that supported Dr. Dlugozima conclusions is written: "Pt. only comes in when he needs a form filled out, not on a regular basis." (R. 303.)

## STANDARDS OF LAW

### The Standard for Finding a Disability

SSI benefits may not be paid to an individual unless that individual meets the income and resource limitations of 42 U.S.C. §§ 1382a and 1382b, and is disabled. 42 U.S.C. § 1382(a). For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

The Social Security Administration ("SSA") has promulgated regulations which establish a five-step sequential analysis an ALJ must follow:

First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability

---

[2]Dr. Dlugozima's first name is not written on the form. (R. 304.)

to do basic work activities." If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501(citations and internal quotation marks omitted). Plaintiff bears the burden of proof for steps one through four. The burden of proof shifts to the Commissioner for the fifth step. *See DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir.1998); *Colon v. Apfel,* No. 98 Civ. 4732 (HB) 2000 WL 282898, *3 (S.D.N.Y., Mar. 15, 2000).

### The Standard of Review

The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal*, 134 F.3d at 501. It is well settled that

it is not the function of a reviewing court to determine *de novo* whether the claimant is disabled. Assuming the Secretary [Commissioner] has applied proper legal principles, judicial review is limited to an assessment of whether the findings of fact are supported by substantial evidence; if they are supported by such evidence, they are conclusive.

*Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980); *see also Williams v. Callahan*, 30 F. Supp. 2d 588, 592 (E.D.N.Y. 1998); *Fishburn v. Sullivan*, 802 F. Supp. 1018, 1023 (S.D.N.Y. 1992). Thus, the scope of review involves first the determination of whether the ALJ applied the correct legal standards, and second, whether the ALJ's decision is supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.

1987). Substantial evidence is more than a mere scintilla. It is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). Although district court is not bound by the Commissioner's conclusions and inferences of law, the ALJ's findings and inferences of fact are entitled to judicial deference. *Grubb v. Chater*, 992 F. Supp. 634, 637 (E.D.N.Y. 1998).

Where there are gaps in the administrative record or where the Commissioner has applied an incorrect legal standard, remand for further development of the record may be appropriate. *Parker*, 626 F.2d at 235. However, where the record provides persuasive proof of disability and a remand would serve no useful purpose, the Court may reverse and remand for calculation and payment of benefits. *Id*.

### Treating Physician Rule

The law gives special weight to the opinion of the treating physician. The SSA's regulations provide:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The various factors applied when the treating physician's opinion is not given controlling weight include: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a

whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. *Id.* The regulations further provide that the SSA "will always give good reasons" for the weight given to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2) (2004); *see also*, *Schaal*, 134 F.3d at 503-504; *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

## ANALYSIS

Plaintiff has not filed any papers in opposition to the Commissioner's motion, despite ample time and notice to do so. (*See* Motion Scheduling Order (# 12), *Winegard v. Barnhart*, No. 02-CV-6231 (Jan. 16, 2003) (setting the time for response to the motion at February 28, 2003).) The Court has no indication that its motion scheduling order was returned undelivered. Therefore, plaintiff's only filing in this case is his form complaint, which states in broad terms that, "[t]he decision of the hearing examiner, as affirmed by the Appeals Council, was erroneous and not supported by either the substantial evidence on the record or the applicable law." (Compl. ¶ 10.) In a similar situation, the Southern District of New York observed:

> Thus, Alvarez does not point to any specific testimony or evidence which he believes the ALJ overlooked, unjustly weighted, or otherwise should have considered. Alvarez's complaint is overly conclusory, and without more, insufficient to defeat the Commissioner's motion for judgment on the pleadings. *E.g., Counterman v. Chater*, 923 F. Supp. 408, 414 (W.D.N.Y. 1996) (Court rejects plaintiff's allegations that the ALJ "failed to consider [minor claimant's] parent's testimony as medical evidence, failed to consider all the medical evidence, failed to consider [child's] mother's testimony with respect to the IFA analysis, and failed to render his decision based upon the record as a whole," on the ground that they are "broad and conclusory. She offers no specific testimony or evidence which she believes that the ALJ overlooked and should have considered."); *Steiner v. Dowling*, 914 F. Supp. 25, 28 n. 1 (N.D.N.Y.1995) (rejecting plaintiffs' argument that the State's social security regulations are too

restrictive as "neither sufficiently explained nor seriously advanced by plaintiffs-providing only a single conclusory paragraph in their Statement of Undisputed Facts . . . , and in their Attorney's Affirmation . . . ."), *aff'd*, 76 F.3d 498 (2d Cir.1996). . . .

*Alvarez v. Barnhardt*, No. 02CIV.3121 JSM AJP, 2002 WL 31663570, *8 (S.D.N.Y. Nov. 26, 2002), *report and recommendation adopted* No. 02 CIV. 3121 JSM AJP, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003); *see also Reyes v. Barnhart*, No. 01 CIV. 4059 (LTS) (JCF), 2004 WL 439495, *3 (S.D.N.Y. Mar. 9, 2004) ("conclusory allegations of Plaintiff's complaint are insufficient to defeat the Commissioner's motion for judgment on the pleadings.").

The ALJ found that plaintiff had not engaged in any substantial gainful activity since the alleged onset of his disability, that he had an impairment or combination of impairments considered to be "severe" under the Commissioner's regulations, but that "[c]onsidering only the limitations that would remain if the claimant stopped using drugs and alcohol, he would not be subject to any impairment or combination of impairments that meets or equals the requirements of the listing of impairments…." (R. 19.) Further, the ALJ determined that plaintiff was not entirely credible regarding his limitations, and retained the residual functional capacity to lift and carry up to 50 pounds occasionally and 25 pounds frequently, with no limitations on his ability to sit, stand and walk, or occasionally bend and climb. (R. 19.) The ALJ also determined that plaintiff had moderate limitations in his ability to maintain attention and concentration for extended periods, understand, remember and carry out complex tasks and to interact with the public. (*Id.*) Based on those physical limitations, the ALJ concluded that plaintiff was not precluded from his past relevant work as an auto painter.

The law bars a finding of disability if drug addition or alcoholism is a "contributing factor material to" the determination of disability. 42 U.S.C. § 423(d)(2)(c) and 1382(a)(3)(I) (2006).[3] In determining whether plaintiff's drug or alcohol abuse are material factors, the ALJ was required to apply the Commissioner's rule codified at 20 C.F.R. § 416.935. That rule states:

> (a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>
> (b) Process we will follow when we have medical evidence of your drug addiction or alcoholism. (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
>
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>
> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>
> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 416.935 (1995).

Here, plaintiff alleged an inability to work due to degenerative disc disease, neck pain, hepatitis C and depression. (Tr. 74.) As required by the rule quoted above, the

---

[3]Enacted by Pub. L. 104-121, 110 Stat. 847 (1996).

ALJ evaluated plaintiff's complaints of physical and mental impairments independent of his drug and alcohol abuse and determined that he would be able to perform his past relevant work as an auto body painter. (R. 18-19.) The Commissioner argues that substantial evidence supports the ALJ's decision. The Court agrees.

Medical assessments from plaintiff's treating physicians indicate that his impairments caused minimal to no exertional limitations. Dr. Mulchandani, who has treated him since January 1998, concluded that plaintiff had no limitations in sitting, standing or walking. (R. 231.) He found plaintiff moderately limited in lifting and carrying and very limited in pushing, pulling and bending. (*Id*.) With regard to his mental abilities, Dr. Mulchandani indicated that plaintiff had no limitations in understanding, remember-ing and carrying out instructions, maintaining attention and concentration, making decisions, interacting with others and maintaining socially appropriate behavior in a work setting. He also indicated that plaintiff did not have limitations as a result of his addictions, but that his hepatitis C would remain even if plaintiff were to cease use of drugs and alcohol. (R. 232.) Nevertheless, no evidence in the record shows that Dr. Mulchandani's indicated limitations would preclude plaintiff from returning to his past relevant work as an auto body painter. Dr. Casey, who has treated him since April 1998, concluded that plaintiff had no notable mental abnormalities, and was not limited in lifting/carrying, standing/walking or sitting. (R. 248.) Consequently, plaintiff's treating physicians' findings support the ALJ's conclusion that plaintiff is not disabled and could perform his past relevant work.

Additionally, physical examination findings and opinions from consultative examiner Dr. Sirotenko likewise support the ALJ's determination. Dr. Sirotenko's

conclusions after examination show: that plaintiff was able to make a fist; that his fine motor coordination was intact bilaterally; that his grip strength was 5/5; that he had full range of motion in all joints; that straight leg raising was negative bilaterally; and that no sensory deficits were noted. Based upon his evaluation, Dr. Sirotenko advised plaintiff only to avoid respiratory triggers which might exacerbate his asthma, to avoid repetitive forward flexion, and to avoid repetitive lifting of objects weighing greater than fifty pounds. (R. 207.) Like the limitations noted by Dr. Mulchandi, these limitations are consistent with an ability to perform medium[4] work.

In determining whether plaintiff could return to his past relevant work, the ALJ also considered plaintiff's subjective complaints and allegations of total disability and found that they were not consistent with his activities and the detailed medical findings of examining and treating physicians. (R. 15, 17-18.) In this regard, the ALJ noted that plaintiff "has not always been honest with treating and examining physicians regarding his medical history and drug and alcohol abuse." (R. 17.) The ALJ then cited the following examples in support of his conclusion:

> On September 22, 1998, he told Dr. Sirotenko that he had been sober since 1998 and had not used illegal drugs in ten years (Exhibit 4F [R. 205]). On that same date, he told Dr. Schorr that he had last used drugs 2 months prior and drank 1 month prior to the examination (Exhibit 5F [R. 214]). The claimant told Dr. Wolfe in August of 2000 that he had an appetite disturbance and had lost 10 pounds (Exhibit 13F [R. 254]). However, records from his reveal that he had a weight gain not a weight loss (Exhibit 12F [R. 244]). The claimant had reported injuring his back to treating physicians in 1990 (Exhibit 2F pp. 12-13 [R. 183-84]). He later changed his history to include an injury to his low back while working on a

---

[4]The ALJ determined that the job of auto body painter requires medium exertion. (R. 18 (*citing* Dictionary of Occupational Titles 8405.31-014).)

car in 1993 (Exhibit 14F [R. 260]).

The claimant had testified at the hearing that he had worked in autobody repair for 10 to 12 years. However, employer records reveal that the claimant had worked in autobody repair much less than that (Exhibit 3D [R. 68-73]).

(R. 17-81.) Additionally, plaintiff testified at the administrative hearing that while incarcerated, he did not use drugs to any degree and was able to "function all right there," including being able to do some fencing and roof work. (R. 30-31.) The Court agrees that substantial evidence supports the ALJ's credibility finding and determines that plaintiff's allegations of complete functional incapacity are not supported by the medical evidence or his own testimony. Therefore, the ALJ was entitled to discredit plaintiff's allegations and subjective complaints.

The ALJ's determination that plaintiff's cervical pain and asthma were not severe is also supported by the evidence in the record. (R. 14.) He based this determination on x-ray and CT scan results showing no abnormalities and the observation that, "his treating physician reported no objective evidence of any cervical spine disease." (R. 14, 123-71, 172-94.) Plaintiff's complaint does not point out any contrary evidence.

Based on the record before it, the Court concludes that the ALJ, in carrying out his responsibility to determine plaintiff's residual functional capacity, *see* 20 D.F.R. §§ 416.927(e)(2), 416.946; *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999), he reasonably concluded that plaintiff retained the ability to do his past relevant work. The record, including the findings and opinions of plaintiff's treating physicians, fully supports the ALJ's residual functional capacity finding. Accordingly, the Commissioner's decision must be affirmed.

**CONCLUSION**

Accordingly, the Commissioner's motion for judgment on the pleadings (# 10) is

granted and, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision is affirmed.

It is So Ordered.

Dated: April 5, 2006
          Rochester, New York

                    ENTER:

                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge